**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C. R. Bard, Inc., | No. CV-21-00284-PHX-DGC |
|        Plaintiff/Counterdefendant, | **ORDER** |
| v. | |
| Atrium Medical Corporation, | |
|        Defendant/Counterclaimant. | |

Plaintiff C. R. Bard, Inc. ("Bard") and Defendant Atrium Medical Corporation ("Atrium") each move for summary judgment on breach of contract and related claims. Docs. 121, 132. The motions are fully briefed and the Court heard oral argument on February 17, 2023. *See* Docs. 139, 142. For reasons stated below, Bard's motion will be granted in part and denied in part and Atrium's motion will be denied.

## I.    Background.

Bard is a New Jersey corporation that makes medical devices. Doc. 53 ¶ 1.[1]  Bard Peripheral Vascular, Inc. ("BPV") is a wholly-owned subsidiary of Bard headquartered in Tempe, Arizona. Doc. 137 ¶¶ 91-92. BPV owns two patents used for prosthetic vascular grafts – U.S. Patent 6,435,135 ("'135 Patent") and Canadian Patent 1,341,519 ("Canadian Patent"). Docs. 130 ¶¶ 3-6, 137 ¶¶ 93-96.

---

[1] Citations are to numbered paragraphs in the documents or numbers attached to the top of pages by the Court's electronic filing system.

1    In August 2010, BPV sued Atrium for infringement of the '135 Patent.  Doc. 137

2  ¶ 97; *see BPV v. Atrium*, No. 2:10-cv-01694-DGC (D. Ariz. 2010).  The Court will refer to

3  this 2010 action as "the Lawsuit."  In March 2011, Bard and Atrium settled the Lawsuit by

4  entering into a License Agreement and a Settlement Agreement which were made effective

5  as of January 1, 2011 (collectively, "the Agreements").  Doc. 130 ¶¶ 9, 63; *see* Docs. 122-2,

6  122-3.

7    Under the Agreements, the Lawsuit was dismissed and Atrium was released from

8  liability for any pre-2011 infringing sales.  Docs. 122-3 § 2.  Atrium was also granted a

9  non-exclusive license to use the '135 Patent and "all other patents of Licensor" that rely on

10  the '135 Patent for priority ("Licensed Patents").  Doc. 122-2 §§ 1.15, 2.1.  Atrium agreed

11  to pay royalties to Bard in the amount of 15% of net sales of Licensed Products with a

12  minimum of $3.75 million quarterly ($15 million per year).  *Id.* §§ 1.16, 3.1, 3.2.  The

13  Agreements stated that Atrium would be barred from filing any challenge to the validity of

14  covered patents ("Validity clause") and that any lawsuit arising under the Agreements

15  would be brought in this Court ("Venue clause").  *Id.* §§ 2.4, 8.5; Doc. 122-3 § 14.  The

16  License Agreement was to remain in effect until the last of the Licensed Patents expired,

17  but could be cut short in certain situations not relevant here.  Doc. 122-2 §§ 7.1, 7.2.

18    The '135 patent expired on August 20, 2019.  Doc. 130 ¶ 7.  The Canadian Patent

19  remains valid until January 2, 2024.  *Id.* ¶¶ 8, 95; Doc. 132 at 9.  After the '135 Patent

20  expired, Atrium reduced its royalty payments to 15% of its net Canadian sales, an amount

21  significantly lower than the quarterly minimum payment of $3.75 million due under the

22  License Agreement.  Doc. 42 ¶ 25.  In June 2021, Atrium also filed a request for

23  reexamination of the Canadian Patent with the Canadian Patent Office.  *Id.* ¶ 45; Doc. 53-3.

24    Bard brought this case to recover minimum royalty payments for the period between

25  expiration of the '135 patent in 2019 and expiration of the Canadian Patent in 2024.  Bard

26  alleges that it owns the '135 Patent and the Canadian Patent through BPV, its wholly-

27  owned subsidiary.  Doc. 53 ¶¶ 6, 8.  Bard further alleges that the Canadian Patent is a

28  Licensed Patent, and that the License Agreement therefore remains effective until the 2024

date when the Canadian Patent expires.  *Id.* ¶¶ 15, 22-23, 31.  Bard asserts several breach of contract claims based on Atrium's failure to make minimum royalty payments under the License and Settlement Agreements (Counts I and IV);[2] Atrium's violation of the Validity clause by filing for reexamination of the Canadian Patent (Count II); and Atrium's violation of the Venue clause by filing for reexamination in Canada (Counts III and V).  *Id.* ¶¶ 51-93.  Bard also asserts claims for declaratory judgment (Count VI), specific performance (Count VII), promissory estoppel (Count VIII), and quantum meruit (Count XII).  *Id.* ¶¶ 94-111, 115-19.

Atrium counterclaims that BPV, not Bard, is the sole owner of the '135 and Canadian Patents.  Doc. 57 ¶¶ 3, 21-22, 55-59.  Atrium claims that because Bard did not own the patents when the License Agreement became effective in 2011, Bard never provided Atrium with a license.  *Id.* ¶¶ 62-76.  Atrium asserts counterclaims for breach of contract, unjust enrichment, fraudulent inducement, and negligent misrepresentation.  *Id.* ¶¶ 4-6, 89-124 (Claims 1-4).

## II.    Summary Judgment Standard.

Summary judgment is appropriate if the moving party shows that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The moving party "bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment, and the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court must view the evidence in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475

---

[2] The Settlement Agreement references the License Agreement and states that the Agreements together "constitute[] the entire understanding and agreement between the Parties" (Doc. 122-3 § 13), but the Settlement Agreement does not expressly require Atrium to make royalty payments.

1   U.S. 574, 587 (1986), and draw justifiable inferences in that party's favor, *Anderson*, 477

2   U.S. at 255.

3   **III.    Atrium's Motion for Summary Judgment.**

4          Atrium moves for summary judgment on Bard's claim that Atrium breached the

5   License Agreement by failing to make minimum royalty payments after the '135 Patent

6   expired in August 2019.  Doc. 121 at 8 (citing Doc. 53 ¶¶ 51-55 (Count I)).[3]  Atrium argues

7   that the License Agreement and its royalty obligations terminated when the '135 Patent

8   expired because the Canadian Patent is not a Licensed Patent that would trigger ongoing

9   royalty obligations.  *Id.* at 6-14.  Specifically, Atrium argues that Bard is the sole

10  "Licensor" under the Agreement's plain language, the Canadian Patent is not a patent "of

11  Licensor" because it is owned by BPV, not Bard, and the Canadian Patent therefore is not

12  a Licensed Patent under the Agreement.  *Id.*  Atrium also seeks summary judgment under

13  the patent misuse doctrine, arguing that the minimum royalty payments impermissibly

14  include royalties for sales of Licensed Products in the United States after the '135 Patent

15  expired.  *Id.* at 6-7, 14-22.

16         **A.    Atrium's argument that the Canadian Patent is not a Licensed Patent.**

17                **1.    Contract interpretation under Delaware law.**

18         The parties agree that Delaware law governs their breach of contract claims.

19  Docs. 121 at 8, 132 at 9.  Under that law, "the proper construction of any contract is purely

20  a question of law."  *Exelon Generation Acq., LLC v. Deere & Co.*, 176 A.3d 1262, 1267

21  (Del. 2017).  The Court's goal is to "determine[e] the intent of the parties from the language

22  of the contract."  *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022).

23  "This inquiry should focus on the parties' shared expectations at the time they contracted,

24  but because Delaware adheres to an objective theory of contracts, the 'contract's

25  construction should be that which would be understood by an objective, reasonable third

26

27         [3] Bard alleges that Atrium also breached the Settlement Agreement by failing to
    make minimum royalty payments (Count IV).  Doc. 53 ¶¶ 77-84.  Atrium does not
28  specifically address this alleged breach of the Settlement Agreement or the contract claims
    based on the Canadian reexamination proceedings (Counts II, III, and V).

party.'" *Exelon*, 176 A.3d at 1267 (quoting *Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010)); *see Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992) ("The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant.").

Courts applying Delaware law "give effect to the plain meaning of the contract's terms and provisions" when the contract is "clear and unambiguous[.]" *Osborn*, 991 A.2d at 1159-60. Courts find a contract ambiguous when they can "reasonably ascribe multiple and different interpretations to [the] contract." *Id.* at 1160. Courts will not ascribe "[a]n unreasonable interpretation [that] produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Id.* at 1160 & n.21 (citations omitted); *see Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, No. CV 17-189-LPS, 2019 WL 1332407, at *3 (D. Del. Mar. 21, 2019) (same).

Extrinsic evidence may not be used to create an ambiguity. *Exelon*, 176 A.3d at 1266-67. But where "a contract is ambiguous, 'the interpreting court must look beyond the language of the contract to ascertain the parties' intentions.'" *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (quoting *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997)); *see also Cox Commc'ns*, 273 A.3d at 760 (Delaware courts "do not consider extrinsic evidence unless [they] find that the text is ambiguous").

### 2. Whether the Agreements' use of "C. R. Bard" includes BPV.

#### a. The Agreements are ambiguous.

Although the License and Settlement Agreements are separate documents, the Court will construe them as a whole because they specifically characterize themselves as "the entire understanding and agreement between the [p]arties[.]" Docs. 122-2 ¶ 8.1, 123-3 § 13, 137 ¶ 129. Delaware law also holds that "contemporaneous contracts between the same parties concerning the same subject matter should be read together as one contract." *Fla. Chem. Co., LLC v. Flotek Indus., Inc.*, 262 A.3d 1066, 1081 (Del. Ch. Aug. 17, 2021).

1
2
3
4

Atrium contends that BPV is not a party to the Agreements.  Bard contends that BPV is included in the Agreements.  The Court finds the Agreements ambiguous because it can "reasonably ascribe multiple and different interpretations" to them.  *Osborn*, 991 A.2d at 1160.

5
6
7
8
9
10
11
12
13
14
15
16

On one hand, the Agreements suggest that Bard is the only Licensor.  The parties to the Agreements are identified as the "Licensor" and "Licensee" (Doc. 122-2 at 2, § 1.24; Doc. 130 ¶¶ 17), "'Licensor' has the meaning given such term in the first paragraph of [the License] Agreement" (Doc. 122-2 § 1.18), and the first paragraph identifies "Licensor" as "C. R. Bard, Inc., a New Jersey corporation, with an address at 730 Central Avenue, Murray Hill, NJ 07974 ('Bard')" (*id.* at 2; Doc. 130 ¶ 15).  Bard agrees this is the address for its headquarters.  Further, the License Agreement provides that any notices "to Licensor" should be sent to "C.R. Bard" at the New Jersey address (Docs. 122-2 § 8.2, 130 ¶ 50), the term "Licensor" is consistently used in the singular rather than the plural "Licensors" (Doc. 130 ¶ 18), the License Agreement does not mention BPV by name, and the Agreements were signed by Bard's "President and COO" but not by any officer of BPV (Docs. 122-2 at 16; 130 ¶¶ 19, 56-59).[4]

17
18
19
20
21
22
23

On the other hand, some provisions in the Agreements make sense only if BPV is included within the meaning of "C.R. Bard" and therefore within the shorthand "Bard" used throughout the Agreements.  For example, the section of the Settlement Agreement calling for dismissal of the Lawsuit stated that "Bard shall, promptly following the Effective Date, take such action, including filing such documents, as required by the Court in order to dismiss the Complaint[.]"  Doc. 122-3, ¶ 2(c).  Because BPV was the sole plaintiff in the Lawsuit, the dismissal could occur only at the request of BPV.  Similarly,

24
25
26
27
28

[4] Atrium notes that a September 2010 Confidentiality Agreement signed by Bard and Atrium as part of their negotiations to settle the Lawsuit specifically included C.R. Bard and its "subsidiaries."  *See* Doc. 122-4 at 2.  Atrium argues that the lack of such language in the later-executed License and Settlement Agreements shows that subsidiaries like BPV were not included.  Atrium does not contend that the Confidentiality Agreement was part of the License and Settlement Agreements, and it is not included in the Agreements' description of "the entire understanding and agreement between the Parties." Docs. 122-2 ¶ 8.1, 123-3 ¶ 13, 137 ¶ 129.  The Confidentiality Agreement thus constitutes extrinsic evidence that will be addressed below.

the Settlement Agreement described the Lawsuit in these terms: "Bard and Atrium are in dispute . . . with respect to certain matters relating to [the '135 Patent.]"   Doc. 122-3 at 2, 130 ¶ 73.   Again, because BPV was the sole plaintiff in the Lawsuit, this statement is accurate only if "Bard" includes BPV.  *See* Doc. 132 at 13.  Further, the License Agreement stated that it would terminate if claims "asserted by Licensor" in the Lawsuit are found to be invalid.  Docs. 122-2 § 7.2(d), 137 ¶ 119.  Because there were no claims asserted by C.R. Bard in the Lawsuit, this termination provision is meaningless unless "Licensor" includes BPV.  Under Delaware law, the Court should avoid an interpretation that renders any provision meaningless.  *See E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985) ("In upholding the intentions of the parties, a court must construe the agreement as a whole, giving effect to all provisions therein.").

The Agreements thus contain some language suggesting that C.R. Bard and Atrium were the sole parties to the Agreements and other language suggesting that BPV was also an integral participant.  The Agreements are ambiguous.  *Rhone-Poulenc Basic Chemicals Co.*, 616 A.2d at 1196 (stating that a contract is ambiguous "when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings").  The Court therefore must look to extrinsic evidence to ascertain what would be understood by a reasonable and objective third party in the same situation.  *See Osborn*, 991 A.2d at 1160; *GMG Cap. Invs.*, 36 A.3d at 780.

### b. Undisputed evidence shows that Bard's interpretation is correct.

Extrinsic evidence often "raises an issue of fact which must be resolved at trial, thereby precluding summary judgment."  *Chesapeake Utils. Corp. v. Am. Home Assur. Co.*, 704 F. Supp. 551, 562 n.23  (D. Del. 1989).  But a court may grant summary judgment "if undisputed extrinsic evidence demonstrates the one and only correct meaning."  *Roche Diagnostics*, a 2019 WL 1332407, at *3; *see Cordis Corp. v. Bos. Sci. Corp.*, 868 F. Supp. 2d 342, 352 (D. Del. 2012) ("If 'the court finds that a contract is ambiguous and that extrinsic evidence is undisputed, then the interpretation of the contract remains a question

of law for the court to decide.'") (citation omitted).  In this case, the following undisputed extrinsic facts show that "C. R. Bard" includes its wholly-owned subsidiary, BPV:

- BPV's infringement claims in the Lawsuit had substantial value.  In August 2010, following a jury trial, BPV obtained a judgment of more than $370 million against W.L. Gore for infringing the '135 Patent.  Doc. 137 ¶ 144; *see* Doc. 1047, *BPV, Inc. v. W.L. Gore & Assocs., Inc.*, No. 2:03-cv-00597-MHM (D. Ariz. 2010).  That same month, BPV filed the Lawsuit against Atrium alleging infringement of the same patent with similar products.  Doc. 1, *BPV v. Atrium*, No. 2:10-cv-01694-DGC (D. Ariz. 2010); Doc. 137 ¶ 97.

- BPV was the only plaintiff in the Lawsuit, and the complaint correctly alleged that BPV owned the '135 Patent.  *Id.* ¶¶ 98-99, 120; *see* Doc. 1 ¶ 9, *BPV v. Atrium*, No. 2:10-cv-01694-DGC (D. Ariz. 2010).

- The parties began settlement talks even before Atrium filed an answer.  In March 2011, after several months of negotiation, the Bard and Atrium settled the Lawsuit by signing the License and Settlement Agreements.  Docs. 122 ¶ 63, 137 ¶¶ 103, 106.

- BPV dismissed the Lawsuit on March 30, 2011.  *Id.* ¶ 138; Doc. 35, *BPV v. Atrium*, No. 2:10-cv-01694-DGC (D. Ariz. 2011).

- The Settlement Agreement stated that it released Atrium from all claims for infringing the '135 Patent before 2011.  Docs. 137 ¶ 131, 122-3 ¶ 2(a).

- The License Agreement stated that it granted Atrium a nonexclusive license to the '135 Patent and related foreign patents until they expired.  Doc. 137 ¶¶ 108, 135; Doc. 122-2 §§ 1.15, 2.1.

- Atrium's attorney and corporate secretary testified that the purposes of the License and Settlement Agreements were to settle the Lawsuit and grant Atrium a license so it could sell its vascular products without being sued again for infringement.  Doc. 137 ¶¶ 105, 133-35.

- The parties understood that both the '135 Patent and the Canadian Patent were being licensed.  During negotiations, Atrium asked Bard to provide a complete list of the "Licensed Patents" and Bard identified the '135 and Canadian Patents. Doc. 137 ¶¶ 110-11.

- After the Agreements were signed, Atrium continued selling its allegedly infringing products and was never sued by BPV or Bard for infringement.  *Id.* ¶ 138.

- Atrium promised in the License Agreement that it would pay Bard minimum royalties of $15 million per year for the term of the Agreement (subject to certain exceptions that have not been triggered).  *Id.* ¶ 125; Doc. 122-2 § 3.2.

- For the next eight years Atrium paid Bard this annual minimum royalty. Doc. 130 ¶ 62.  The present dispute arose only after the '135 Patent expired in 2019 and Atrium reduced its royalty payments below the minimum amount. Doc. 37 ¶ 24; Doc. 42 ¶¶ 24-25.

From these undisputed facts, the Court can readily determine the intent of the Agreements as it would be understood by a reasonable and objective third party in the positions of Atrium, Bard, and BPV:  (1) the Lawsuit would be dismissed, (2) Atrium would be released from liability for past infringement, (3) Atrium would be granted a non-exclusive license for future sales, and (4) Atrium would pay at least $15 million in royalties per year for the remainder of the License Agreement.  Significantly, none of these goals could be realized unless BPV was a party to the Agreements.  BPV was the sole plaintiff in the Lawsuit and the only entity that could dismiss the case and release Atrium from its claims.  BPV, as alleged in the Lawsuit, was the owner of the patents and thus the only entity that could license them to Atrium.  Atrium agreed to pay many millions of dollars for BPV's dismissal of the Lawsuit and for the ongoing and uninterrupted use of the patents.  Thus, a reasonable person in the position of the parties would have understood that the participation of BPV was essential to the Agreements – that "C.R. Bard" necessarily included its wholly-owned subsidiary BPV.  *Rhone-Poulenc Basic Chems. Co.*,

616 A.2d at 1196 ("The true test is . . . what a reasonable person in the position of the parties would have thought [the contract] meant.").  This conclusion is strengthened by the fact that Atrium paid $130 million over the next several years for a dismissal, release, and license that could come only from BPV.[5]

This interpretation comports with Delaware law, which requires the Agreements to be "read in full and situated in the commercial context between the parties."  *Chi. Bridge & Iron Co. N.V. v. Westinghouse Elec. Co.*, 166 A.3d 912, 927 (Del. 2017).  Indeed, "[w]hen interpreting a contract, 'it is helpful to look at the transaction from a distance in order to give sensible life to a real-world contract.'"  *Fortis Advisors LLC v. Stora Enso AB*, No. CV 12291-VCS, 2018 WL 3814929, at *5 (Del. Ch. Aug. 10, 2018) (quoting *Heartland Payment Sys., LLC v. Inteam Assocs., LLC*, 171 A.3d 544, 557 (Del. 2017)).  The only sensible meaning to this transaction is that BPV was a party to the Agreements.

Delaware law also states that "[a]n unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract."  *Osborn*, 991 A.2d at 1160.  Atrium's proposed interpretation would produce an absurd result that no reasonable person in the positions of Atrium, Bard, or BPV would have accepted.  Consider these consequences if the Agreements included only C.R. Bard and not BPV:

- o Atrium agreed to pay millions of dollars in exchange for a promise of dismissal from an entity that was not a party to the Lawsuit.
- o Atrium agreed to pay millions of dollars with no release from the actual plaintiff in the Lawsuit.
- o Atrium agreed to pay millions of dollars without obtaining a license from the entity identified in the Lawsuit as the owner of the patents.
- o Atrium paid $130 million for a patent license it did not receive.

---

[5] Atrium argues that Bard had 70 subsidiaries at the time of the Agreements and Atrium could not have known that the Agreements included one specific subsidiary – BPV. Doc. 121 at 5 n. 2.  But only one Bard subsidiary sued Atrium in the Lawsuit, alleged that it owned the patents Atrium had infringed, and dismissed the Lawsuit when the Agreements were signed.  Atrium knew which Bard subsidiary was involved.

o C.R. Bard entered into agreements that were essentially meaningless because no effective release or license was conveyed to Atrium and Atrium's obligation to pay therefore could not be enforced.

o BPV dismissed a valuable lawsuit but did not convey a release or license, and therefore had no assurance that the future royalties to be paid for dismissal of the Lawsuit and use of its patents would ever be received.

No reasonable person on any side of this arrangement would have entered such a contract. From the undisputed facts set forth earlier and Delaware's requirement of a sensible interpretation, the Court concludes that the reference to C.R. Bard in the Agreements clearly included its pivotal wholly-owned subsidiary, BPV.

Atrium makes several arguments to the contrary, none of which is persuasive.

Atrium asserts that whether it received a license to the '135 Patent is "a fact clearly in dispute." Doc. 134 at 14 (citing Doc. 137 ¶ 102). But the only fact Atrium disputes in this regard is whether BPV told Atrium to direct all negotiations to counsel for Bard. *See* Doc. 137 ¶ 102. The Court does not find that fact material in construing the Agreements based on the undisputed extrinsic evidence recited above.

Atrium argues that no Bard witness has testified that the meaning of "Licensor" was ever discussed by the parties. Doc. 121 at 12 (citing Doc. 122 ¶¶ 20-22). But this fact, if true, supports the Court's interpretation more than Atrium's. The clear goals of the Agreements – to settle the Lawsuit brought by BPV, grant Atrium a release from past infringement and a license to BPV's patents, and obligate Atrium to pay millions for use of those patents – could be accomplished only if BPV was involved. A failure to discuss "Licensor" more likely meant that such discussions were unnecessary in light of the clear purposes of the Agreements.

Finally, as mentioned above, Atrium notes that the Confidentiality Agreement signed months before the License and Settlements Agreements specifically referred to C.R. Bard's "subsidiaries," while the later Agreements did not. *See* Doc. 122-4 at 1. True, but this single piece of evidence does not overcome the many undisputed facts that show the

1    true purposes of the Agreements as outlined above – purposes that could be accomplished

2    by the parties only if BPV was a participant.

3        One other aspect of Atrium's argument should be noted.  In moving for summary

4    judgment on Bard's contract claim, Atrium strategically limits its focus to the Canadian

5    Patent.  Atrium argues that the Canadian Patent is not a Licensed Patent because Bard does

6    not own it, and that the period for paying royalties therefore ended with the expiration of

7    the '135 Patent.  Doc. 121 at 6-13.  But Atrium actually seeks much more than a mere end

8    to its royalty obligations.  If Atrium is correct that BPV was never a party to the

9    Agreements, then the License Agreement was never effective and the $130 million Atrium

10   paid under the Agreements must be refunded (setting aside Bard's promissory estoppel and

11   quantum meruit claims for the moment).  Indeed, Atrium's counterclaim asks for just such

12   a refund.  *See* Doc. 57.  This too would produce an absurd result – Atrium's receiving

13   dismissal of BPV's valuable lawsuit and years of uninterrupted use of the BPV patents for

14   free.  *See Osborn*, 991 A.2d at 1160; *Urdan v. WR Cap. Partners, LLC*, 244 A.3d 668, 675

15   (Del. 2020) (courts must interpret contracts reasonably and "not as hoped for by litigation-

16   driven arguments").[6]

17       In summary, the Court finds from the undisputed facts recited above that the only

18   reasonable interpretation of the Agreements includes BPV as a party with its parent, C.R.

19

---

20   [6] The Court might be able to resolve this case another way.  Atrium admits that it is
21   "axiomatic" that Bard, as the corporate parent, can exercise control over BPV, its wholly-
     owned subsidiary.  Doc. 134 at 8.  This power is recognized in Delaware law.  *See*
22   *Weinstein Enters., Inc. v. Orloff*, 870 A.2d 499, 506 (Del. 2005) (explaining that a parent
     corporation can exercise control over a wholly-owned subsidiary).  Bard's control over
23   BPV would include power to make BPV dismiss the Lawsuit and grant a release and a
     nonexclusive license, which essentially is a covenant not to sue.  *See* Doc. 132 at 15; *Disk*
24   *Authoring Techs. LLC v. Corel Corp.*, 122 F. Supp. 3d 98, 110 (S.D.N.Y. 2015) (applying
     Delaware law and explaining a subsidiary's failure to sign the license agreement was
25   irrelevant because the corporate parent company could accept a license on their behalf);
     *see also Molon Motor & Coil Corp. v. Nidec Motor Corp.*, 946 F.3d 1354, 1360-61 (Fed.
26   Cir. 2020) ("A covenant not to sue is equivalent to a nonexclusive or 'bare' license, which
     is a promise . . . not to sue the licensee for practicing the patented invention").  Relying on
27   this authority, the Court might accept Atrium's argument that Bard is the sole party to the
     Agreements and hold, nonetheless, that Bard as the parent corporation had authority to
28   perform all its promises.  While this approach might lead to the same result as this order,
     it would be less consistent with language in the Agreements which calls on "Bard" to act
     rather than committing Bard to cause BPV to act.

Bard.  Because this interpretation is clear from undisputed evidence, the Court may enter summary judgment for Bard on this point.  *Diagnostics*, a 2019 WL 1332407, at *3; *Cordis Corp.*, 868 F. Supp. 2d at 352; Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact . . . that is not genuinely in dispute and treating the fact as established in the case.").

### 3.     Judicial estoppel.

Atrium contends that Bard is judicially estopped from arguing that "Licensor" in the License Agreement includes BPV.  Curiously, Atrium makes this argument only in a footnote.  Doc. 121 at 9 n.1.  The Court will address the argument despite its minimal emphasis.

Early in this case, Atrium moved to dismiss Bard's complaint for failure to state a claim for relief, arguing that "Delaware law construes 'Licensor' to mean what it says: C.R. Bard."  Doc. 61 at 7.  Atrium further argued that dismissal was warranted because Bard did not allege that "Licensor" included BPV and any such allegation "would not pass muster under *Iqbal* and *Twombly*[.]"  *Id.* at 18.  Bard responded by saying that "Bard, not BPV, is the Licensor."  Doc. 65 at 16.  In denying Atrium's motion, the Court noted Bard's position: "Bard does not dispute that it is the sole Licensor under the Agreement."  Doc. 76 at 7.  Atrium argues that Bard is now estopped from changing its position and arguing that BPV is in fact a Licensor.

Judicial estoppel "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase."  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (citation omitted).  Courts consider three factors: (1) whether a party's later position is "clearly inconsistent" with its earlier position, (2) "whether the party has succeeded in persuading a court to accept that party's earlier position," and (3) whether the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  *Id.* at 750-51.

The third requirement is not satisfied. Although Bard has taken troublingly inconsistent positions during this litigation, the Court cannot conclude that it derived an unfair advantage or imposed an unfair detriment on Atrium by virtue of those positions.

When the Court denied Atrium's motion to dismiss, it noted Atrium's argument that BPV was not part of the License Agreement (which Bard at the time did not dispute) and Bard's position that Bard owned and controlled the licensing of the patents through its ownership of BPV. But the Court found that the question of patent ownership and control "requires robust fact development" and could not be resolved one way or the other at the motion to dismiss stage: "to the extent the issue of patent ownership is material to the breach of contract claim, that issue is best resolved on summary judgment or at trial." *Id.* at 8. The Court cited several Delaware cases that reach similar conclusions. *Id.*

Atrium's motion to dismiss also argued that Bard could not plausibly allege that BPV was in fact a party to the Agreements. *Id.* at 5-6. The Court did not address this argument given Bard's position at the time, but had it done so, the Court would have rejected the argument for reasons explained above – the Agreements cannot reasonably be read as including Bard and not BPV. What is more, the Court found Bard's claims plausible for essentially the same reasons applied in this order. *Id.*; *see also In re Greenberg*, 626 B.R. 554, 568 (S.D. Cal. 2021) (concluding that the creditor would not derive an unfair advantage from its inconsistent positions because the court would have made the same finding and the debtor "would thus find himself in the same situation that he is now").

Because Bard did not derive an unfair advantage or impose an unfair burden on Atrium through its previous inconsistent position, the third element of judicial estoppel is lacking. Bard therefore is not barred from making its current arguments. *See Greenberg*, 626 B.R. at 568; *Russell v. Rolfs*, 893 F.2d 1033, 1037 (9th Cir. 1990) (judicial estoppel "is an equitable doctrine invoked by a court at its discretion").[7]

---

[7] Atrium asserted at oral argument that Bard's inconsistent positions wasted Atrium's and the Court's resources. Doc. 142 at 54. This is not sufficient for judicial estoppel to apply. *See Greenberg*, 626 B.R. at 568 (the "change in position, though

1

    **4.**    **The *contra preferentem* rule.**

2        Atrium argues that the rule of *contra preferentem* requires any ambiguity in the

3 License Agreement to be resolved against Bard because it drafted the relevant provisions

4 of the Agreement.  Doc. 121 at 13 (citing *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840

5 A.2d 624, 630 (Del. 2003)).  But the rule "should be a tool of last resort where the disputed

6 language is 'hopelessly ambiguous,' i.e., cannot be resolved by resort to extrinsic

7 evidence." *Twin City*, 840 A.2d at 630 (quoting *Kaiser Aluminum Corp. v. Matheson*, 681

8 A.2d 392, 398 (Del. 1996)); *see E.I. du Pont de Nemours*, 498 A.2d at 1114 (the rule "is

9 one of last resort, such that a court will not apply it if a problem in construction can be

10 resolved by applying more favored rules of construction"); *Lamps Plus, Inc. v. Varela*, 139

11 S. Ct. 1407, 1417 (2019) ("The rule applies 'only as a last resort' when the meaning of a

12 provision remains ambiguous after exhausting the ordinary methods of interpretation.")

13 (citations omitted).  Because the Court can determine the correct meaning of "Licensor"

14 from undisputed extrinsic evidence, *contra preferentem* does not apply.

15

    **5.**    **Conclusion.**

16        The correct interpretation of "C. R. Bard" in the Agreements is one that includes

17 BPV.  The Canadian Patent therefore is a Licensed Patent within the meaning of the

18 License Agreement and royalty obligations have not ceased.  The Court will deny Atrium's

19 motion for summary judgment based on the argument that the Canadian Patent is not a

20 Licensed Patent under the Agreements.  *See* Doc. 121 at 8-14.

21        In a footnote, Atrium seeks summary judgment on Bard's alternative claims for

22 promissory estoppel and quantum meruit (Counts VIII and XII) under Arizona law.

23 Doc. 121 at 13 nn. 5-6 (citations omitted).  But it is undisputed that Delaware law applies

24 to all claims arising out of or relating to the Agreements, including the promissory estoppel

25 and quantum meruit claims.  Doc. 130 ¶ 52; *see also* Docs. 122-2 § 8.5, 122-3 § 14, 142 at

26

27     arguably an ill-suited use of . . . resources, has not prejudiced Greenberg"); *In re Tower*
*Park Props., LLC*, No. CV 13-1518-GHK, 2013 WL 3791462, at *4 (C.D. Cal. July 18,

28 2013) ("We do not condone such unscrupulous tactics, as they waste judicial resources.
Nonetheless, TPP has neither gained any substantive advantages in this litigation with its
inconsistent positions, nor imposed unfair detriments on FTIC.").

1    65-66.  Because Atrium has not shown that those claims fail under Delaware law, its

2    footnote request for summary judgment will be denied.

3        **B.    Atrium's patent misuse argument.**

4        Under the patent misuse doctrine, "a patentee's use of a royalty agreement that

5    projects beyond the expiration date of the patent is unlawful per se."  *Brulotte v. Thys Co.*,

6    379 U.S. 29, 32-33 (1964); *see Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 449 (2015)

7    (affirming *Brulotte*'s holding that "a patent holder cannot charge royalties for the use of

8    his invention after its patent term has expired").  "Determining the reach of *Brulotte*'s

9    barrier to the collection of royalties requires [the Court] to consider the scope of the royalty

10   provision[s.]  In other words, [the Court must] ask both what [Atrium] is paying royalties

11   for and under what conditions its obligation to do so is lawful."  *Zila, Inc. v. Tinnell*, 502

12   F.3d 1014, 1025 (9th Cir. 2007).  The parties agree that patent misuse is an equitable

13   defense that must be resolved by the Court rather than a jury.  Doc. 142 at 62-64.

14       The License Agreement contains several provisions relating to royalties.  These

15   include a "Royalties" provision in § 3.1, a "Minimum Royalties" provision in § 3.2, and a

16   "Payment of Royalties" provision in § 3.3.  Docs. 122-2 at 5-7, 130 ¶¶ 34-35.  Atrium

17   argues that the patent misuse doctrine excuses it from paying minimum royalties after

18   August 2019 because those royalties include, at least in part, royalties for the sale of

19   Licensed Products in the United States after the '135 Patent expired.  Doc. 121 at 14-22.

20   In other words, Atrium contends that the minimum royalties provision requires it to

21   continue paying royalties for use of the '135 Patent after that patent expired.[8]

22       Bard contends that there is no evidence to support Atrium's characterization of the

23   minimum royalty provision.  Bard argues that the provision was not compensation for use

24   of the '135 Patent after its expiration, but instead was compensation for Atrium's pre-2011

25   infringing sales (the subject of the Lawsuit) and for off-label sales of Atrium's iCast

26

27   ───────────────

28       [8] Atrium agrees that if the Canadian Patent is a Licensed Patent, Atrium must pay
     royalties under § 3.1 for its sales of Licensed Products in Canada until the Canadian Patent
     expires in January 2024.  *See* Doc. 142 at 56.

products.  Doc. 132 at 18-19.[9]  Bard characterizes the royalties provision in § 3.1 as compensation for Atrium's ongoing sales of Licensed Products, and the minimum royalties provision in § 3.2 as a separate and alternative provision to ensure Bard received compensation for the pre-2001 and iCast sales.  *Id.*

### 1.    The royalty provisions are ambiguous.

The Court does not agree with Bard's claim that there is no evidence to support Atrium's argument.  Such evidence can be found in the royalty provisions themselves, which can be read to suggest that minimum royalty payments include payments for use of the '135 Patent through the entire term of the License Agreement.  Section 3.1 requires Atrium to pay "a royalty of fifteen percent (15%) of the Net Sales of Licensed Products" during the term of the Agreement.  Docs. 122-2 § 3.1, 130 ¶ 34.  By referring to Licensed Products, this section includes products using the '135 patent.  *See* Doc. 122-2 § 1.16.  The minimum royalties provision follows next in § 3.2, and can reasonably be read as setting a floor for the royalties due under § 3.1:  "in no event will royalties for any calendar quarter of the [t]erm be less than [$3.75 million.]"  Docs. 122-2 § 3.2, 130 ¶ 35.  The word "royalties" in this phrase appears to refer to the royalties called for in § 3.1 – royalties that cover use of the '135 Patent.  This interpretation finds support in § 3.3, which requires Atrium to provide regular royalty statements "setting forth all amounts due pursuant to [§] 3.1."  Doc. 122-2 § 3.3.  In the event the royalty amount set forth in the statement (which includes '135 Patent royalties) is less than the minimum royalty specified in § 3.2, then Atrium "must also include payment to [Bard] of such amount as is required to satisfy [Atrium's] minimum royalty obligation[.]"  *Id.*  In other words, the $3.75 million minimum to be paid each quarter includes royalties due under section 3.1, which include payments for use of the '135 Patent, plus any additional amount needed to reach the minimum.[10]

_____

[9] Although iCast products were used for vascular treatment at the time of the Agreements, they were not identified as Licensed Products because they had no FDA clearance for vascular uses.  *See* Doc. 122-2 § 1.16, at 17-18; Doc. 137 ¶ 126.

[10] Atrium notes, correctly, that Bard previously acknowledged a correlation between minimum royalties and the sale of Licensed Products.  Doc. 134 at 12-13; *see, e.g.*, Doc. 57 ¶ 19 ("Minimum Royalties are due and owing if the sale by Atrium of Licensed Products

Bard's interpretation is also reasonable.  A clear purpose of the Agreements was to settle the Lawsuit in which Bard sought substantial damages for Atrium's infringing sales before 2011.  The Agreements expressly released Atrium from those claims and yet included no immediate payment to Bard as consideration.  From this basic and undisputed fact it is reasonable to conclude that the minimum royalties provision was included at least in part to compensate Bard for the past infringement.  *See* Docs. 122-2 § 3, 132 at 18-19.  This understanding is bolstered by the fact that Atrium agreed to pay the Minimum Royalty even if it sold no products that used the '135 Patent.  *See* Doc. 122-2 § 3.2.

The Court cannot determine whether one of these interpretations is correct to the exclusion of the other, or whether they both are correct with minimum royalties including both kinds of payments.  The Court must look to extrinsic evidence to determine the correct meaning.  *See GMG Cap. Invs.*, 36 A.3d at 780.

## 2.      Extrinsic evidence raises issues of fact.

There is evidence to support Bard's contention that the minimum royalties were included, at least in part, to pay for pre-2011 infringing sales.  Atrium's president, Chad Carlton, testified that "Atrium understood the linkage between 15 million annual minimum royalties and past liability . . . up to January 1st, 2011." Doc. 131-15 at 64.  A former vice-president of Atrium, Theodore Karwoski, testified that minimum royalties "covered anything [Atrium] had done . . . since the issuance of the ['135 patent." Doc. 123-10 at 35.  And one of Atrium's attorneys, William Scofield, testified that minimum royalties were also intended to address Atrium's sales of iCast products.  Doc. 123-9 at 25; *see also* Docs. 130 ¶¶ 37-38, 137 ¶¶ 121, 128.

There is also evidence to support Atrium's contention that minimum royalties were intended to compensate Bard for Atrium's sales of Licensed Products in the United States after the '135 Patent expired.  Bard's expert, Minh Doan, testified that while the minimum royalty provision was intended to capture royalties on sales prior to 2011 and sales of iCast

---

worldwide does not generate royalties equal to or greater than the Minimum Royalties."); Doc. 25 at 8 ("The terms of the License Agreement clearly and indisputably require, when sales of Licensed Products generate royalties under § 3.1 of less than $3,750,000, for Atrium to pay the difference.").

- 18 -

products, it "also captured royalties after 2011 for licensed product sales, which never exceeded the minimum royalty." Doc. 134 at 13 (quoting Doc. 123-6 at 46); *see also* Docs. 121 at 16, 130 ¶ 39. Doan further explained, however, that Atrium was not required to pay royalties for use of the '135 Patent after its expiration. Doc. 123-6 at 46-47. Instead, the parties estimated the "total royalty burden through August 2019, [and] came up with . . . a minimum royalty structure that . . . spread out the payments even beyond August 2019." *Id.* at 47. Bard contends that this payment structure is not patent misuse because "*Brulotte* allows a licensee to defer payments for pre-expiration use of a patent into the post-expiration period." Doc. 132 at 19 (quoting *Kimble*, 576 U.S. at 453).

The Court finds evidence to support both parties' positions and cannot determine the extent to which minimum royalties after August 2019 include payments for use of the '135 patent. This factual issue precludes summary judgment for either party. Further evidence is needed for the Court to resolve this issue and determine the extent to which the patent misuse doctrine invalidates minimum royalty payments made after expiration of the '135 Patent. *See Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1023 (9th Cir. 2007) ("*Brulotte* renders unenforceable only that portion of a license agreement that demands royalty payments beyond the expiration of the patent for which the royalties are paid.").

Relying on § 1.16 of the License Agreement, Bard argues in a footnote that once the '135 Patent expired there were no U.S. "Licensed Products" because "Licensed Products" include only products "sold in a country where one or more claims of the Licensed Patents are issued and outstanding." Doc. 132 at 18 n.4. Because there were no Licensed Products in the U.S., Bard argues, royalty payments for Licensed Products could not have included use of the '135 Patent.

There appears to be a reason Bard relegated this argument to a footnote. It is not supported by the language of § 1.16:

"Licensed Products" means (i) the products of Licensee incorporating expanded polytetrafluoroethylene (ePTFE) in existence as of the Effective Date, as set forth on Exhibit A to this Agreement, (ii) upon Licensee's receipt of approval from the FDA to market and sell such products with a vascular indication, the Non-Vascular Products [set forth on Exhibit B] and (iii) all

1
2
3
4

other products of Licensee incorporating ePTFE that are not colorably different than the products set forth on Exhibit A or Exhibit B to this Agreement, in each case, that are made, used, offered for sale and/or imported or *sold in a country where one or more claims of the Licensed Patents are issued and outstanding*.

5
6
7
8
9
10

Docs. 122-2 § 1.16, 130 ¶ 28 (emphasis added).[11]  Bard relies on the italicized language, but that language applies only to the third "catch-all" category of Licensed Products in § 1.16(iii).  It does not apply to the products in § 1.16(i), which appear to be the products for which Atrium has been paying royalties.  Bard's footnote says nothing about this issue.  Nor has Bard presented evidence that the products sold by Atrium after the '135 Patent expired somehow fell under § 1.16(iii).

11

**III.   Bard's Motion for Summary Judgment.**

12
13
14
15
16
17

Bard seeks summary judgment that Atrium has breached the minimum royalties provision (Counts I and IV).  Doc. 132 at 5.  The factual issue related to the patent misuse argument prevents summary judgment on this claim.  The Court will, however, grant Bard's motion to the extent it argues that the correct interpretation of the Agreements is that "C. R. Bard" includes BPV.  Fed. R. Civ. P. 56(g).  This conclusion is supported by the undisputed evidence described above.

18
19
20
21
22
23
24

Bard also seeks summary judgment on Atrium's breach of contract, unjust enrichment, negligent misrepresentation, and fraudulent inducement counterclaims.  *Id.* at 5.  Bard notes, correctly, that a central premise of the counterclaims is Atrium's contention that BPV is not a party to the Agreements and Atrium therefore never received a license to the '135 and Canadian Patents.  *Id.* at 11.  Bard argues that the counterclaims fail because "C.R. Bard" in the Agreements includes BPV.  *Id.* at 11-15.  For reasons stated above, the Court agrees.

25
26

Since "C.R. Bard" includes BPV, "Licensor" also includes BPV and Atrium received a license from BPV.  *See* Doc. 122-2 § 2.1.  Further, BPV dismissed the Lawsuit

27
28

---

[11] Exhibit A identifies several "Licensed Products," and Exhibit B identifies one "Non-Vascular Product" (the iCast family of products).  Doc. 122-2 at 17-18.

and did not sue Atrium for its continued sales of the allegedly infringing products. Doc. 137 ¶ 138.  Atrium paid royalties at the agreed-upon price for uninterrupted use of the '135 and Canadian Patents for the next eight years.  Doc. 130 ¶ 62.  In short, Atrium received everything it bargained for at the agreed-upon price.  *See* Docs. 132 at 15-16, 137 ¶¶ 133-35.  Because the Agreements include BPV, Bard did not breach them, make negligent misrepresentations, unjustly enrich itself, or fraudulently induce Atrium to enter the Agreements.  The Court will grant summary judgment on Atrium's counterclaims.  *See* Doc. 53 ¶¶ 89-124.

**IT IS ORDERED:**

1.     Atrium's motion for summary judgment (Doc. 121) is **denied**.

2.     Bard's motion for summary judgment (Doc. 132) is **granted in part** and **denied in part** as set forth in this order.

3.     The parties' motions to seal (Docs. 125, 127, 129) are **granted**.  The Clerk is directed to file the lodged documents (Docs. 126, 128, 130) under seal with the same document number.

4.     By **April 1, 2023**, the parties shall file a joint memorandum setting forth their views on the appropriate method for resolving the factual issue presented by the patent misuse argument as discussed above, and the appropriate method for resolving the remaining claims in this litigation.  The Court will then schedule a telephonic status hearing with the parties.

Dated this 23rd day of March, 2023.

David G. Campbell
Senior United States District Judge