WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| C. R. Bard, Inc., | No. CV-21-00284-PHX-DGC |
| Plaintiff/Counterdefendant, | **ORDER AND JUDGMENT** |
| v. | |
| Atrium Medical Corporation, | |
| Defendant/Counterclaimant. | |

This order sets forth the Court's findings of fact and conclusions of law following a two-day bench trial on June 22-23, 2023. *See* Fed. R. Civ. P. 52(a)(1). The Court holds that the License Agreement's extension of minimum royalty payments beyond August 20, 2019 constitutes patent misuse. Thus, in addition to the judgments already entered on the parties' cross-motions for summary judgment (Doc. 143), the Court will enter judgment in favor of Defendant Atrium Medical Corporation ("Atrium") on claims by Plaintiff C. R. Bard, Inc. ("Bard") seeking to collect the minimum royalties due since that date.

**I.   Background.**

Bard is a New Jersey corporation that makes medical devices. Doc. 53 ¶ 1.[1]  Bard's subsidiary, Bard Peripheral Vascular, Inc. ("BPV"), owns two patents for expanded polytetrafluoroethylene ("ePTFE") vascular grafts – U.S. Patent 6,435,135 ("135 Patent") and Canadian Patent 1,341,519 ("Canadian Patent").  Docs. 130 ¶¶ 3-6, 137 ¶¶ 93-96.

---

[1] Citations are to numbered paragraphs in the documents or numbers attached to the top of pages by the Court's electronic filing system. The Court will cite to some portions of the record in this order, but not to all evidence supporting its findings.

In August 2010, BPV sued Atrium for infringement of the 135 Patent ("the Lawsuit"). Doc. 137 ¶ 97; *see BPV v. Atrium*, No. 2:10-cv-01694-DGC (D. Ariz. 2010). In March 2011, Bard and Atrium settled the Lawsuit by entering into a License Agreement and a Settlement Agreement which were made effective as of January 1, 2011 (collectively, "the Agreements"). Exs. 1-2.[2] Under the Agreements, the Lawsuit was dismissed and Atrium was released from liability for any pre-2011 infringing sales. Ex. 2 § 2.

The License Agreement granted Atrium a non-exclusive license to use the 135 Patent and "all other patents of Licensor" that rely on the 135 Patent for priority ("Licensed Patents"). Ex. 1 §§ 1.15, 2.1. The License Agreement contains two significant provisions relating to royalties: a 15% royalty on certain products in § 3.1 and a minimum annual royalty of $15 million in § 3.2. Ex. 1. These will be discussed in more detail below.

After the 135 Patent expired in August 2019, Atrium stopped paying the annual minimum royalty and paid only 15% of its net Canadian sales, a relatively small amount. Doc. 42 ¶ 25. Bard brought this case to recover minimum royalty payments.

Bard asserts breach of contract claims based on Atrium's failure to make minimum royalty payments under the License and Settlement Agreements. Doc. 53 ¶¶ 51-55, 77-84 (Counts I and IV).[3] Bard also seeks a declaratory judgment that the minimum royalties provision is enforceable, and an order requiring specific performance of the Agreements. *Id.* ¶¶ 94-106 (Counts VI and VII). In the alternative, Bard seeks relief under the equitable theories of promissory estoppel and quantum meruit. *Id.* ¶¶ 107-11, 115-19 (Counts VIII and XII).[4]

---

[2] This order cites exhibits that were admitted in evidence for purposes of the bench trial. *See* Doc. 174. These exhibits are identified in Doc. 169. Rather than adopt the parties' exhibit designations (JTX, PTX, and DTX), the Court will cite exhibits as "Ex." followed by the specific exhibit number.

[3] The Settlement Agreement references the License Agreement and states that the Agreements together "constitute[] the entire understanding and agreement between the Parties" (Ex. 2 § 13), but the Settlement Agreement does not expressly require Atrium to make royalty payments.

[4] Bard has dismissed its breach of contract claims based on Atrium's filing for reexamination of the Canadian Patent (Counts II, III, and V). Docs. 152, 154.

Atrium moved for summary judgment on Bard's claim that Atrium breached the License Agreement by failing to make minimum royalty payments after the '135 Patent expired. Doc. 121 at 8. Atrium argued that the License Agreement and its royalty obligations terminated when the '135 Patent expired because the Canadian Patent is not a Licensed Patent that would trigger ongoing royalty obligations. *Id.* at 6-14. Specifically, Atrium argued that Bard is the sole "Licensor" under the Agreement's plain language, the Canadian Patent is not a patent "of Licensor" because it is owned by BPV, not Bard, and the Canadian Patent therefore is not a Licensed Patent under the Agreement. *Id.*

Applying Delaware law, which governs the claims in this case, the Court found the language of the Agreements to be ambiguous as to whether BPV was a party. Doc. 143 at 5-7. Based on undisputed extrinsic evidence, however, the Court determined that the only reasonable interpretation of the Agreements includes BPV as a party. *Id.* at 7-13. The Court accordingly denied Atrium's motion based on the argument that the Canadian Patent is not a Licensed Patent under the Agreements. *Id.* at 15.

Atrium also sought summary judgment on its the patent misuse defense (Doc. 42 ¶ 120), arguing that the minimum royalty payments impermissibly include royalties for sales of Licensed Products in the United States after the 135 Patent expired. Doc. 121 at 14-22. The Court denied summary judgment in this regard, finding that the License Agreement's royalty provisions are ambiguous and that extrinsic evidence raises issues of fact that must be resolved at trial. Doc. 143 at 20.[5]

Bard moved for summary judgment on its contract claims alleging that Atrium has breached the minimum royalties provision. Doc. 132 at 5. While the factual issues on the patent misuse defense prevented summary judgment on these claims, the Court did grant Bard's motion to the extent it argued that BPV was a party to the Agreements. Doc. 143 at 20.

---

[5] Atrium's footnote request for summary judgment on Bard's promissory estoppel and quantum meruit claims (Doc. 121 at 13 nn. 5-6) was denied because Atrium relied on non-applicable Arizona law. Doc. 143 at 15-16.

3

Bard also sought summary judgment on Atrium's counterclaims for breach of contract, unjust enrichment, fraudulent inducement, and negligent misrepresentation. Doc. 132 at 11-15; *see* Doc. 57 ¶¶ 89-124.  Each counterclaim is premised on the contention that BPV is not a party to the Agreements and Atrium therefore never received a license to the 135 and Canadian Patents.  *See id.*  Because the Court found that the Agreements include BPV, it granted summary judgment in favor of Bard on Atrium's counterclaims.  Doc. 143 at 20-21.

After the Court's summary judgment rulings, the parties proposed a bench trial on Atrium's patent misuse defense and Bard's claims for breach of contract, declaratory judgment, specific performance, promissory estoppel, and quantum meruit.  Doc. 145 at 2. As noted, the bench trial was held on June 22-23, 2023.  *See* Docs. 177-78.

**II.    Initial Findings of Fact.**

   **A.    Atrium Products.**

When Bard sued Atrium in 2010, Atrium was selling various ePTFE products that had received FDA approval for vascular uses.  These consisted of various vascular grafts and related products that were accused by Bard of infringing the 135 Patent and that ultimately were listed in Exhibit A to the License Agreement. Ex. 1 at 16.  They will be referred to in this order as "Vascular Products."  Chad Carlton, Atrium's president, testified at trial that Vascular Products constituted about $6 million of Atrium's $55 million in annual U.S. sales in 2010 – about 11% of U.S. sales.  Doc. 186 at 57.

A much larger share of Atrium's U.S. sales at the time of the Lawsuit – nearly 90% – was attributable Atrium's iCast product.  iCast consisted of a metal stent coated with ePTFE.  Atrium sold it only in the U.S.  Although iCast had been cleared by the FDA only for tracheobronchial uses, it frequently was used off-label by doctors for vascular purposes. In fact, about 99% of Atrium's iCast sales were for off-label uses.  Docs. 162 at 6, 186 at 119.  Bard believed that iCast infringed the 135 Patent.  It was included in the parties' settlement and was listed as a "Non-Vascular Product" in Exhibit B to the License Agreement.  Ex. 1 at 17.

**B.     The Parties' Motivations in the 2011 Settlement.**

Bard and Atrium both had strong motivations to settle the Lawsuit. Bard recently had obtained an enormous judgment against W.L. Gore for infringement of the 135 Patent. The judgment included court-ordered royalties that would pay hundreds of millions of dollars to Bard. Although Bard wanted to end Atrium's alleged infringement of the 135 Patent, it did not want to relitigate the validity of the patent or the question of infringement by ePTFE products like Gore's and Atrium's. Such litigation would risk a judgment inconsistent with the Gore result and might jeopardize the substantial cash stream Bard was receiving from Gore. Charles Krauss, an in-house attorney and Bard's lead negotiator in the settlement talks, provided this testimony at trial:

> To give you some context, Gore was the 800-pound gorilla in the room. There was so much value attached to what Gore was selling and then there's a huge drop off when we got to what Atrium was selling. We didn't want to do anything that was going to jeopardize the validity of the patent and disrupt our potential cash pipeline from the Gore royalties by this agreement. That was always in the back of our mind.

Doc. 187 at 203.

Even so, Bard insisted on receiving royalties for Atrium products it viewed as infringing the 135 Patent. Bard's interest in royalties focused primarily on iCast, not only because iCast was Atrium's best-selling product but also because Atrium was seeking FDA approval for vascular uses of iCast, an approval that would result in significantly higher iCast sales in the future. In describing Bard's objective in the settlement negotiations with Atrium, Krauss testified: "It's always the iCast. Everything is iCast that we're focused on." *Id.* at 220. Even with Bard's powerful motivation to settle the case against Atrium and not jeopardize the Gore judgment, Krauss testified that there would have been no deal if payments for iCast sales were not included. *Id.*

Atrium was also motivated to settle. It recognized not only that Bard had obtained an enormous judgment against Gore for selling similar products, but also that defending against Bard's infringement claims would be costly and distracting. Atrium was also trying

5

to sell itself in 2010-2011 and knew that a pending substantial lawsuit could discourage potential buyers.

### C. The Settlement Negotiations.

Bard filed the Lawsuit against Atrium on August 10, 2010. The parties commenced settlement discussions before any significant litigation activity occurred. The primary negotiators were attorneys Bill Scofield for Atrium and Charles Krauss for Bard.

The parties exchanged settlement proposals between November 2010 and January 2011, with an agreement on basic terms finally being reached on January 20, 2011. Documentation of the settlement took until late March. The Agreements were made effective as of January 1, 2011, and the Lawsuit was dismissed on March 30, 2011.

### D. Section 3.1 – 15% Royalty on Licensed Products.

Two royalty provisions are particularly relevant to the parties' dispute. The first, in § 3.1 of the License Agreement, provides that Atrium will pay Bard 15% of the net sales of all "Licensed Products" as defined in the Agreement. Ex. 1 § 3.1. Licensed Products included Atrium's Vascular Products. The obligation to pay Bard a 15% royalty would end for products sold in the U.S. when the 135 Patent expired on August 20, 2019. *Id.* § 1.16.

This end-date is fixed by the last phrase in the definition of Licensed Products, which states that Licensed Products are those "made, used, offered for sale and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." *Id.* The 135 Patent was a U.S. patent. Once it expired on August 20, 2019, there would be no Bard patent "issued and outstanding" for the U.S. and Atrium products sold in the U.S. would no longer be Licensed Products subject to the 15% royalty in § 3.1. *Id.* §§ 1.16, 3.1.

The Court incorrectly construed § 1.16 in its summary judgment order, concluding that it did not apply to all categories of Licensed Products. Doc. 143 at 19-20. At trial, the Court received evidence that Atrium proposed the geographic limitation and specifically suggested that it apply to all Licensed Products. Ex. 34; Doc. 187 at 243, 264-65. Bard

6

accepted Atrium's proposal and incorporated the limitation into the definition of Licensed Products, with slightly different wording.[6] Thus, all Licensed Products identified in § 1.16 are subject to the geographical limitation quoted above.[7]

### E.     Section 3.2 – Minimum Royalties.

The second relevant royalty provision is found in § 3.2 of the License Agreement and requires Atrium to pay Bard a minimum royalty of $3.75 million per quarter ($15 million per year). Ex. 1 § 3.2. This minimum royalty included the 15% due on net sales of Licensed Products covered by § 3.1. *Id.* This fact is made clear by § 3.3, which requires Atrium to provide a regular royalty statement "setting forth all amounts due pursuant to [§] 3.1." *Id.* § 3.3. In the event the amounts in the statement are less than the minimum royalty specified in § 3.2, Atrium "must also include payment to [Bard] of such amount as is required to satisfy [Atrium's] minimum royalty obligation[.]" *Id.*

Section 3.2 stated that the minimum royalty obligation would end if either of two events occurred. The first was if the FDA cleared Atrium's iCast product for vascular uses. *Id.* § 3.2(a). In that event, the minimum royalty provision would end, iCast would become a Licensed Product under § 1.16, and Atrium would owe a 15% royalty on iCast sales until expiration of the 135 Patent in 2019. *Id.* Evidence at trial established that Atrium fully expected to receive FDA clearance of iCast for vascular uses within a year or two of the Agreements, and communicated this expectation to Bard.

---

[6] Scofield proposed adding the following sentence to what is now § 1.16: "As used herein, the term Licensed Products means the above-listed products that are made, used, offered for sale, and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." Ex. 34. Bard accepted this proposal, but revised the sentence slightly by making it a final clause of § 1.16 which reads: "in each case, that are made, used, offered for sale, and/or imported or sold in a country where one or more claims of the Licensed Patents are issued and outstanding." Exs. 35, 36. Testimony at trial confirmed that the intent was for this geographical limitation to apply to all Licensed Products identified in § 1.16. Doc. 187 at 243; Doc. 188 at 264-65, 304-06.

[7] The Court's error did not result in incorrect denial of Bard's motion for summary judgment on its breach of contract claims. The fact that Licensed Products ended on August 20, 2019 does not mean that no royalties were paid after that date, as Bard had argued. The minimum royalties discussed below continued to be required by the License Agreement. The Court thus would have denied Bard's motion for summary judgment on its breach of contract claim even if the Court had correctly construed the geographical limitation in § 1.16.

7

Minimum royalties would also end if the FDA rescinded its approval of iCast for all purposes, including the tracheobronchial uses for which iCast was authorized at the time of the Agreements. *Id.* § 3.2(b). Because the minimum royalty provision was intended to compensate Bard for sales of iCast products, Atrium did not want the royalty to continue if it was forced to terminate those sales.

If neither of these contingencies occurred, the minimum royalty due under § 3.2 would remain in effect until the License Agreement terminated. Under its terms, the License Agreement would terminate when the last of the Licensed Patents expired. *Id* §§ 7.1, 7.2. Because the Canadian Patent does not expire until January 2, 2024, the License Agreement would remain in effect until that date, as would the minimum royalty obligation if neither of the FDA contingencies had occurred.

### F. The Parties' Arguments.

Atrium did not obtain FDA approval for vascular use of iCast until March of 2023. Nor did the FDA rescind iCast's approval for tracheobronchial uses. As a result, the License Agreement's $15 million annual minimum royalty remained in effect beyond the 2019 expiration of the 135 Patent. It ended in March of this year when the FDA finally granted approval of iCast for vascular uses. *See* Ex. 1 § 3.1(a).

Atrium argues that the patent misuse doctrine excuses it from paying minimum royalties after August 2019 because those royalties include, at least in part, royalties for the sale of products in the United States after the 135 Patent expired.[8] Bard counters that there is no evidence to support Atrium's characterization of the minimum royalty provision. Bard argues that the provision was not compensation for use of the 135 Patent after its expiration, but instead was compensation for a bundle of things included in the License and Settlement Agreements, including Atrium's pre-2011 infringing sales (the

---

[8] Atrium agrees that if the Canadian Patent is a Licensed Patent – which it is under the Court's summary judgment ruling (Doc. 143 at 15) – Atrium must pay 15% royalties under § 3.1 for sales of Licensed Products in Canada until the Canadian Patent expires in January 2024. *See* Doc. 142 at 56.

8

subject of the Lawsuit), off-label sales of iCast products before 2019, and the release granted by Bard in the Settlement Agreement.

### III. Patent Misuse Doctrine.

Under the patent misuse doctrine, "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful per se." *Brulotte v. Thys Co.*, 379 U.S. 29, 32-33 (1964); *see Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 449 (2015) (affirming *Brulotte*'s holding that "a patent holder cannot charge royalties for the use of his invention after its patent term has expired"). "Determining the reach of *Brulotte*'s barrier to the collection of royalties requires [the Court] to consider the scope of the royalty provision[s]. In other words, [the Court must] ask both what [Atrium] is paying royalties for and under what conditions its obligation to do so is lawful." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1025 (9th Cir. 2007). The parties agree that patent misuse is an equitable defense that must be resolved by the Court rather than a jury, and that Atrium bears the burden of proof. Docs. 142 at 62-64, 145 at 1, 152 at 2, 153 at 2, 162 at 12, 165 at 21.

### IV. Further Findings of Fact.

#### A. The Parties' Negotiations Before December 6, 2010.

On November 10, 2010, Bill Scofield sent Atrium's opening settlement proposal to Charles Krauss. Atrium proposed to pay royalties of 15% or 20% on Vascular Products, 10% or 15% on iCast sales, and 10% on sales before the date of the jury verdict in the Gore case, with all of these obligations to be subject to the outcome of the appeal in Bard v. Gore. Ex. 13. No time period for the payments was specified.

Krauss responded in an email dated November 24, 2010. Ex. 14. Bard counter-proposed royalties of 10% on all sales between 2002 (the year the 135 Patent became effective) and the second quarter of 2007, and 15% on all sales of Atrium products from the third quarter of 2007 (when the Gore verdict was rendered) to 2019 (the year when the 135 Patent expired). *Id.* The email made clear that iCast products would be included, and one-third of the royalties for the 2002-2007 sales could be escrowed pending the result in the Bard v. Gore appeal. *Id.*

9

This proposal, like the initial Atrium proposal, would create what Charles Krause called a "per-use" royalty – the royalty would be due on each sale of an Atrium product. The proposal was modeled after the royalties ordered in the Gore case and was Bard's preferred method of payment. Doc. 187 at 203. The proposal also included a 2019 end-date for future royalties, including the iCast royalties. Ex. 14.

Atrium responded in an email from Scofield to Krauss on December 2, 2010. Ex. 15. The email proposed 10% on all Vascular Products and iCast products before July 1, 2007, 15% on all Vascular Products after that date, 10% on iCast products after that date (or 15% if peripheral equipment was not included in the purchase price), with royalties for iCast products to be escrowed until after the Bard v. Gore appeal. *Id.* Krauss was pleased that Atrium appeared to be agreeing to a per-use royalty for iCast and thought the parties were close to a deal. Doc. 187 at 208.

Krauss responded to Scofield on December 3, 2010. Ex. 102. He stated that Bard's management was focused on a 15% royalty rate going forward for "all grafts and covered stents, regardless of indication" – an express inclusion of iCast – but could be more flexible on past royalties, including the rate and the terms of any escrow. *Id.*

**B.     Atrium's December 6, 2010 Pivot Away From iCast Royalties.**

Things changed on December 6, 2010. Scofield sent Krauss an email enclosing an article suggesting that Atrium's iCast products did not infringe the 135 Patent because iCast was approved by the FDA only for tracheobronchial uses and not for vascular uses. Ex. 103.  Atrium contended that it made and sold iCast products for approved tracheobronchial uses, which were not covered by the 135 Patent, and the fact that doctors independently elected to use them for off-label vascular purposes did not mean Atrium was infringing the patent. Doc. 187 at 137-41. Having prevailed on this issue in its case against Gore, Krauss testified that there was "no way" Bard's management would accept Atrium's new position. *Id.* at 210.

When asked about the significance of this attempt by Atrium to pull iCast sales out of the settlement agreement, Krauss testified: "It was huge. The entire value of the deal to

us was the future of the [iCast sales]." *Id.* at 211.  Krauss reiterated, however, that Bard still wanted to settle:

> We did not want [Atrium and iCast] on the market but we would accept them coming onto the market because we didn't want to disrupt the cash flow that would be coming in via Gore. . . .  [I]f we had to litigate the case against Atrium and somehow they invalidated the patent, the Gore cash pipeline would go away.

*Id.*

On December 15, 2010, Krauss emailed Scofield and said Atrium's pivot on iCast was so significant that Bard doubted Atrium was serious about settling.  Ex. 105.  Scofield responded on December 20, 2010, stated that Atrium remained serious about resolving the Lawsuit, and explained that Atrium was concerned that payment of per-use royalties for iCast off-label sales could cause the FDA to conclude that Atrium was illegally selling iCast products for such off-label uses and jeopardize the FDA's approval of iCast for vascular uses.  Ex. 106.  Krauss was not persuaded, and doubted the parties could reach a settlement: "If they are pulling out the true value of the deal to us, which was the iCAST, I don't think we're that close."  Doc. 187 at 215.  Krauss testified that Bard was not going to remove iCast royalties from the settlement.  *Id.*

Atrium made a new proposal on January 3, 2011.  Scofield's email proposed a 15% royalty on all Vascular Products and minimum royalties of $15 million per year for 2011 and 2012.  Ex. 16.  Krauss viewed this proposal as offering at least some value for iCast (in the form of minimum payments), but he was not willing to accept a minimum royalty for only two years because, if the FDA did not approve iCast for vascular uses within those two years, Bard would thereafter receive nothing for iCast sales.  Doc. 187 at 217-18.

Atrium essentially reiterated this offer on January 11, 2011, saying it was Atrium's final offer.  Ex. 18.  Krauss viewed it as "more words, same result."  Doc. 187 at 221.

**C.    The Parties Reach Agreement on Basic Terms.**

Bard responded with its own final offer on January 12, 2011.  *Id.*  Krauss described the offer as "our last shot at if we have a deal or not."  *Id.* at 222.  Bard proposed that it

11

would release Atrium for all past claims, Atrium would pay a 15% royalty on Vascular Products, and Atrium would pay the proposed $15 million minimum royalty "until all current ePTFE products have received a U.S. vascular indication" – in other words, until iCast received vascular approval from the FDA. *Id.* at 222-23. Atrium accepted this proposal on January 20, 2011. Ex. 18.

Krauss explained at trial why Bard was willing to give up its demand for per-use royalties on iCast (which Krauss referred to as the "Gore model"), and accept a minimum annual royalty instead:

> Q. . . . [Y]ou've accepted their Minimum Royalty model for the first time. Do you see that?
>
> A. I do.
>
> Q. Explain the difference here.
>
> A. Well, the Minimum Royalty payments of $3.75 million per quarter will be made until all current ePTFE products have received a U.S. vascular indication. At this time, it was only the iCAST product that didn't have this. We didn't want to bet on whether the FDA would or would not approve their product and so we even made movement on this concept of the minimum payment.
>
> Q. So which was preferable, the Minimum Royalty payment to you or having a per-use royalty?
>
> A. I wanted the Gore model which was a per-use model. I wanted all of our deals to reflect that same model.
>
> Q. So why would you willing to accept this flat-fee-per-quarter model?
>
> A. Because we didn't want to put the validity of the [135] patent in jeopardy by having to litigate with a party and the chance that it overturns the apple cart and destroys that really important [Gore] revenue stream at the company.
>
> Q. So instead of the per-use model, what are you trying to get at with this $3.5 million –

> A. It's the closest thing we could come to as a proxy for some type of rough valuation that we weren't going to be left not getting paid anything. So it's a gross approximation of what we wanted . . . , which was the Gore model. There's no exact calculation we could handle. But our management said okay, 3.75 a quarter, we can live with that, realizing we're not going to put the [135] patent's validity in jeopardy.

Doc. 187 at 223-24.

### D. No Specific Time Limit for Minimum Royalties.

Bard's final offer included no specific termination date for the $15 million minimum annual royalty payments. They would end at a future indeterminate date when iCast received vascular approval from the FDA. As Krauss testified:

> Q. Now in this document, does it set a term for the length of the Minimum Royalty payment?
>
> A. It said the one way it could term it is to get the U.S. vascular indication.

*Id.* at 224. When asked whether the FDA's approval date could be known with any certainty, Krauss said: "I wouldn't accept anyone's representation that the FDA is going to do anything by a certain date." *Id.* at 217. Nor did Bard's final proposal include a specific end date for the License Agreement:

> Q. . . . Does it set a term in terms of the duration of the agreement?
>
> A. No. That term was later defined in the actual drafting of the document.

*Id.* at 224.

### E. Setting the Duration of the License Agreement.

Following Atrium's acceptance of the basic deal proposed by Bard, lawyers for Bard drafted the License Agreement and sought comments from Bill Scofield. Bard's draft included a standard provision stating that the agreement would endure until the last of the covered patents expired. Ex. 20 § 7.1. Atrium did not object to this provision. *See* Exs. 23, 34. In fact, both Scofield and Krauss testified that it is a standard provision for license agreements. Doc. 187 at 180-81, 235.

Bard's draft also included not only the 135 Patent, but "all other patents of Licensor issued anywhere in the world that rely on the [135 Patent] for priority." Ex. 20 § 1.15. Atrium did not object, and Scofield testified that this too is a standard provision. Exs. 23, 34; Doc. 187 at 179-84. Atrium did not know what other patents would be covered by the agreement until January 28, 2011, when a Bard attorney told Scofield that the Canadian Patent would also be included. Ex. 22.

The 2024 end date of the License Agreement, based on the termination date for the Canadian Patent, was never discussed by the parties during their settlement negotiations. Doc. 187 at 151-57, 176, 187-88, 231-37. Nor did they ever discuss the License Agreement lasting until 2024 or the minimum royalty payments lasting that long if the FDA did not approve Atrium's request for a vascular approval of iCast or reject iCast approvals altogether. Doc. 186 at 66-67; Doc. 187 at 126, 136-56, 182. Further, the parties never discussed the fact that minimum royalty payments for sales of iCast products between 2011 and 2019 would in part be deferred to minimum payments made after 2019. Doc. 186 at 67-69, 108; Doc. 187 at 136-59, 180-82; Doc. 188 at 276-77, 317-18.

## V.   The Court's Key Factual Findings.

Based on the facts set forth above and other evidence presented at trial, the Court finds the following key facts:

- Royalties for Atrium's ongoing sales of iCast were the primary financial goal of Bard's settlement negotiations. Bard viewed iCast royalties as the "true value," the "heart of the deal." Doc. 187 at 215-16.

- Bard would not have agreed to the settlement without getting compensation for iCast. *Id.* at 220, 223. As Bard stated in its trial brief:

    [T]he Minimum Royalty was important to make sure Bard was compensated for sales of Atrium's infringing iCAST product. By the time the parties entered into the License Agreement, iCAST already was by far Atrium's largest grossing ePTFE product despite the fact that it did not have an FDA-approved vascular indication. . . . [Bard was] steadfast that regardless of the label, the iCAST infringed the 135 Patent and needed to be accounted for in the License Agreement.

14

Doc. 162 at 5-6.

- Atrium pivoted away from a per-use royalty for iCast because of concerns that this form of royalty could jeopardize FDA approval of iCast for vascular uses, and instead proposed a $15 million minimum annual royalty. Rather than reject the minimum and proceed with the Lawsuit, thereby risking invalidation of the patent that was providing Bard with hundreds of millions of dollars in royalties from Gore, Bard accepted the minimum as a means of compensating it for Atrium's use of the 135 Patent in the iCast products. As Krauss testified: "the Minimum Royalty was the proxy for some value ascribed to the iCAST product." Doc. 187 at 119; *see also id.* at 224, 226, 232.

- When the parties agreed on the basic terms of the settlement, they had not discussed and agreed on the duration of the License Agreement or the duration of the minimum royalties if the FDA did not act. They had agreed only on the $15 million minimum as a means to compensate Bard for iCast sales.

- The parties never discussed how long the License Agreement or the minimum royalties provision would last. *Id.* at 231 (Krauss: "Q: Was there any discussion about the length of the term? A. Never."). Nor did they discuss or agree that the minimum royalties reflected only iCast sales between 2011 and 2019, or that payments of the minimum after 2019 would somehow represent only iCast sales before 2019.

- The parties never calculated the approximate value of per-use iCast royalties between 2011 and 2019, and they never apportioned that approximation over the period from 2011 to 2024. In fact, Krauss testified that the value of iCast sales could not be calculated, explaining: "We couldn't get any more precise. We didn't know what was going to happen." *Id.* at 232.

- Only after the parties agreed that Bard would be paid for iCast sales through the minimum annual royalty of $15 million did the parties agree on the length of the License Agreement. That happened when boilerplate language was adopted for the Agreement's Term (until the last to expire of the covered patents) and the covered patents (including the Canadian Patent). *See* Ex. 1 §§ 1.15, 7.1. This was not a deal where the

15

parties agreed on a value for the iCast license between 2011 and 2019 and then agreed on a longer payout period until 2024. The extension of the License Agreement and minimum royalty payments to 2024 happened without any discussion of the issue, through adoption of industry-standard provisions.

- The purpose of the minimum royalty payments when Atrium accepted Bard's basic terms on January 20, 2011 – to compensate Bard for iCast sales – remained the same throughout the life of those payments. Nothing in the evidence suggests that this purpose changed when the 135 Patent expired on August 20, 2019. The License and Settlement Agreements are silent on that point and the parties never discussed it. The Court finds that the purpose of the minimum royalty payment after the 135 Patent expired was the same as the purpose before it expired: to compensate Bard for iCast sales. Charging Atrium a minimum royalty for U.S. sales of iCast products after the 135 Patent expired is patent misuse.

- Bard's claim that minimum payments after 2019 constituted reimbursement for iCast sales before 2019 is not based on any agreement between the parties. It was never discussed. It was never agreed to. The initial purpose of the minimum payments remained unchanged throughout the life of the License Agreement.

- The Court recognizes that the foregoing is a somewhat simplified discussion. The minimum royalty payments initially also included the 15% royalties for U.S. sales of Vascular Products (*see* Ex. 1, §§ 3.2, 3.3), but those royalties ended when the 135 Patent expired because Vascular Products no longer constituted Licensed Products in the U.S. under § 1.16 and royalties were no longer required under § 3.1.[9] The minimum royalties also covered allegedly infringing sales that occurred before the Lawsuit, but that portion was fully paid by 2015, when the Settlement Agreement provided that the release of Atrium for those past sales would be complete. Ex. 2, § 2(a). And even if some portion of past damages continued to be part of the minimum royalties paid after the 135 Patent expired,

---

[9] After expiration of the 135 Patent, the 15% royalties on Canadian sales of the Vascular Products would continue to be part of the quarterly and annual minimum royalty, but only a small portion of those payments.

it would only be a small part. As noted above, Bard viewed the iCast sales as "the true value of the deal" and expressed a willingness to be more forgiving on past damages. Doc. 187 at 215; Ex. 102.

## VI. Atrium Has Met Its Burden of Proof.

Bard cites case law suggesting that Atrium must prove patent misuse by clear and convincing evidence. Doc. 162 at 12-13. Atrium cites cases applying a preponderance-of-the-evidence standard. Doc. 165 at 21-22. The parties agree that the cases are split on this issue. *See id.*; Doc. 188 at 382.

Atrium prevails regardless of the standard that is applied. The clear and primary purpose of the minimum royalty provision was to compensate Bard for iCast sales. That was true before and after the 135 Patent expired. The License Agreement's requirement of minimum royalties for this purpose after the 135 Patent expired is patent misuse and is unenforceable.

The Court accordingly will enter judgment in favor of Atrium on Bard's breach of contract claims based on Atrium's failure to make minimum royalty payments after the 135 Patent expired, and on the related claims for declaratory judgment and specific performance. *See* Doc. 53 ¶¶ 51-55, 77-84, 94-106 (Counts I, IV, VI, and VII).[10]

## VII. Bard's Promissory Estoppel and Quantum Meruit Claims Also Fail.

Bard seeks an order requiring Atrium to make minimum royalty payments until the FDA's vascular approval of iCast in March 2023. Doc. 162 at 20. Bard contends that it is entitled to those royalty payments under the equitable theories of promissory estoppel and quantum meruit even if the License Agreement's minimum royalty provision is unenforceable for patent misuse. *Id.* at 19-21. According to Bard, Atrium benefitted greatly from the License Agreement by being able to defer its payments for past damages and iCast royalties into the future. *Id.* at 20. But as explained above, the parties never discussed or agreed that compensation for past damages and sales of iCast products between 2011 and 2019 would be deferred to payments made after 2019.

---

[10] The parties agree that the Court's ruling on Atrium's patent misuse defense will resolve each of these claims. Doc. 145 at 2.

17

What is more, Bard's patent misuse bars the equitable relief it seeks. *See* Doc. 165 at 26-28. The patent misuse doctrine arose "from the desire to restrain practices that did not in themselves violate any law, but that drew anticompetitive strength from the patent right, and thus were deemed to be contrary to public policy." *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1025 (Fed. Cir. 2008) (citation omitted); *see In re Gabapentin Pat. Litig.*, 648 F. Supp. 2d 641, 654 (D.N.J. 2009) (explaining that "patent misuse can be found where the patentee's conduct violates the public policies addressed by the patent laws") (citing *Morton Salt Co. v. G. S. Suppiger Co.*, 314 U.S. 488, 494 (1942)). The patent misuse defense "is an extension of the equitable doctrine of unclean hands, whereby a court of equity will not lend its support to enforcement of a patent that has been misused." *Qualcomm*, 548 F.3d at 1025; *see C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) ("The defense of patent misuse arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage."); *U.S. Gypsum Co. v. Nat'l Gypsum Co.*, 352 U.S. 457, 465 (1957) ("It is now, of course, familiar law that the courts will not aid a patent owner who has misused his patents to recover any of their emoluments accruing during the period of misuse . . . . The rule is an extension of the equitable doctrine of 'unclean hands' to the patent field."); *Morton Salt*, 314 U.S. at 492-94 (linking patent misuse to the doctrine of "unclean hands" and noting "[e]quity may rightly withhold its assistance from such a use of the patent").

Because the License Agreement's requirement of minimum royalties for iCast sales after the 135 Patent expired is patent misuse, the Court will deny Bard's request for equitable relief that would accomplish the same thing. "To hold otherwise would frustrate the public policy that makes the [requirement] unenforceable in the first place." *Columbus Life Ins. Co. v. Wilmington Tr.*, N.A., No. CV 20-736-MN-JLH, 2021 WL 1820614, at *5 (D. Del. May 6, 2021) ("The doctrine of unclean hands 'is a rule of public policy' that permits a court to refuse a request for equitable relief 'in circumstances where the litigant's own acts offend the very sense of equity to which he appeals.' . . . As courts have

explained, a contract that is *void ab initio* because it violates public policy may not be enforced through the application of equitable doctrines."); *see Wilmington Sav. Fund Soc'y, FSB v. PHL Variable Ins. Co.*, No. 13-499-RGA, 2014 WL 1389974, at *12 (D. Del. Apr. 9, 2014) (holding that a contract that is void for public policy may not be enforced equitably through theories of promissory estoppel or unjust enrichment); *see also Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 669 (1944) ("It is sufficient to say that in whatever posture the issue may be tendered courts of equity will withhold relief where the patentee [is] using the patent privilege contrary to the public interest."); *Brulotte*, 379 U.S. at 31 (explaining that any "continuation in the patentee . . . of the patent monopoly, after the patent expires, *whatever the legal device employed*, runs counter to the policy and purpose of the patent laws.") (emphasis added). The Court will enter judgment in favor of Atrium on Bard's claims for promissory estoppel and quantum meruit. *See* Doc. 53 ¶¶ 107-11, 115-19 (Counts VIII and XII).

**IT IS ORDERED:**

1. **Judgment** is entered in favor of Defendant Atrium Medical Corporation on Plaintiff C. R. Bard, Inc.'s claims for breach of contract, declaratory judgment, specific performance, promissory estoppel, and quantum meruit (Counts I, IV, VI-VIII, and XII).

2. The parties' motions to seal (Docs. 158, 161, 164) are **granted**. The Clerk is directed to file the lodged documents (Docs. 159, 162, 165) under seal with the same document number.

Dated this 30th day of June, 2023.

David G. Campbell
Senior United States District Judge